Good morning, Your Honors. May it please the Court, Ray Tippmann on behalf of Kvaerner E & C. As we see it, there's essentially two issues in this case. The first is whether or not Yellow Freight met its burden of summary judgment on its own affirmative defense. The second, and the one I'd like to start with, is application of the statute. When I apply statutes, I like to start with the statute. I'm kind of torn here the same way I was in that other case. We have that case where I'm looking at it and saying, shall we follow the statute or shall we follow Hunter? And in this one, I feel like it's shall we follow the statute or shall we follow G.I. Trucking? You're bound by G.I. Trucking. I'm sorry? We're bound by G.I. Trucking. Yeah, I believe we are bound by G.I. Trucking and also the Culver case. But I would say that further that it's perfectly consistent with the statute. And there's two key words in the statute that I think support the holdings in both G.I. Trucking and Culver. As it states what the three elements of a proper notice would be, the third one says making claim for payment of a specified or determinable, so that's one key word, determinable amounts of money, and it goes on, shall be considered sufficient compliance. So what the statute gives us is what would be considered sufficient. But sufficient, of course, does not mean necessary. So the Ninth Circuit has taken that word sufficient and say, well, what does that mean in this context? And it said that substantial performance is enough. So the three elements that would be sufficient. We're looking now not at the statute, but the regulation. The regulation. Thank you. You're right, Your Honor. 49 CFR 105.2, subsection B. That's correct. And just to quote G.I. Trucking, the standard for determining sufficiency, so it's determining that word sufficient, is one of substantial performance. So both the statute and the cases do not require you to meet every element of the regulation perfectly to the full extent. By statute, you mean the regulation as well. The regulation, correct, Your Honor. So in understanding that word sufficient, the G.I. Trucking and also Culver say substantial performance is enough. In concrete terms, what it's further said is that oral communications and actual knowledge can count. The other word I wanted to focus on from the regulation is the word determinable. And, again, that's where G.I. Trucking comes into play. It says determinable doesn't mean you have to specify an amount of money. If you've given them enough information, if you've given the carrier, Yellow Freight in this situation, enough information where they can go and investigate and find out for themselves what the extent of the damage is, then you satisfy the statute. So now to apply the statute to the letter at hand, I believe it's not contested that the first two elements of the regulation were satisfied completely. There's no doubt that the letter, and we can turn to the letter if you'd like, but I think there's no doubt that the letter identifies the baggage. It goes through and lists it item by item with model number and so on. It describes the damage to each item. Nor is there any doubt that the letter asserts liability for the alleged loss and advises Yellow Freight it intends to seek those damages. So there's no doubt that at least two of the three elements or factors in the regulation are satisfied, and the only question is the third one, which would be a dollar amount or a determinable amount of money. As we know, the district court and Yellow Freight have both said, and I quote, the only thing missing is an amount, and that's where we turn again to GI Trucking. It expressly rejects the conclusion that an amount of money is required for a letter to be sufficient. So as you recall from the briefs, that was one reversible error that we argued for in our briefs. If it was determinable from the letter, that would be good enough for me, but here's what I'm thinking. I don't know anything about the transportation business earlier. I guess I had one major case in practice, but I did a lot of insurance stuff, and with insurance, the way it works is the insurance company knows what level claims person can handle the claim depending on how big the claim is, and the settlement authority is affected by that, and also what lawyers they hire, whether they try out somebody new, whether they use their established big claim person. The amount of the claim really matters to them in how they handle it, and it looks to me as though there's no way they can tell from this February 8, 2000 letter how big the claim is. Why doesn't that matter? Well, I would say first it does describe the damage, and it also includes pictures of the damage, but even on top of that. I would have it. I didn't see the – I guess I've got these attachments here, but I don't have the pictures, but I can't tell how much money is involved. I believe the picture is at AR 0361. Look, I'm not in the business of delivering pumps, so I can't look at this and tell you the dollar amount either, but for people who practice in this industry, it says coupling guard missing. Well, Cabrera would know how much money is involved, but would the freight company? They're not in the pump business. They're in a freight business. Well, the yellow freight representative was actually at the site when the damaged items came in, and he inspected the site. Yeah, but money. And two months later, he was called on the telephone by a representative and said, look, I have a damage claim here for $70,000 to $75,000. As we see under Culver, an oral communication. If I shipped through yellow freight a photograph by Fox Talbot and a photograph by Fenton and they ruined them, they got them soaked, I would have some notion of the order of magnitude of the claim because I know something about old photographs. They would have no idea, even if they looked at them. They don't know if it's worth $20 or $20,000. And I believe there's – Picking the pumps is the same thing. Cabrera knows, but yellow freight doesn't. Yellow freight may not. I have two responses to that. The first one is that they were told. It's undisputed that in March, well within the nine-month requirement, Cabrera's representative talked to Denver Price, the person for yellow freight who did the inspection, and told him precisely the damage estimate is $70,000 to $75,000. We received an invoice. This is what it says. We want to make sure there's nothing further out there, but that's our estimate right now. And under the case of Culver, an oral communication like that counts towards the sufficient compliance. And I wanted to give you a cite for that, too. The telephone conversation was testified to at AR 085, lines 10 to 15, and again at AR 290, lines 10 to 23. Thanks. What is the strongest evidence in this entire record to establish a determinable amount of money? I would say there's three strongest pieces of evidence. The first is the letter itself, which, as I've said, it lists through the items. It says what needs to be replaced, and it includes pictures. The second item would be the inspection. And I wanted to give you the cite for that, too. That's at page 410, AR 0410, is the inspection report. And the testimony concerning the inspection report that mentions dollars in any amount. That's right. But, again, as the Ninth Circuit has interpreted determinable, it means if the carrier has enough information where they can go and investigate for themselves. So the fact that they failed to go and investigate is not Covernor's fault. So the fact that we told them the damage, they actually inspected it, gave them that opportunity. And then the third piece of information, I think, is that telephone conversation, and I've just given those citations as well, in which they actually told them the dollar amount. And, in fact, if you look at the regulation, it says if there's a claim for an uncertain amount of damages, the obligation is then on the carrier to go and inspect and find out or make whatever record they want. If they choose to do nothing, that's not Covernor's fault. That's Yale Freight's fault. Hold on a second. Yeah. In 290, it looks like the critical words here are I called them, I told them, I explained the situation to them that I had an estimate I wanted to submit for this claim, which I believe they would be aware of, and I wanted to know who I should address it to or send it to. And, really, at that point, they stopped me. She stopped you? She stopped me and said that, well, we need you to submit this on a Yale Freight form or else we can't process it. So at least that little bit, it looks to me as though he didn't communicate the amount because the woman he was talking to didn't want to hear it. She wanted him to submit it on a form. That's the second conversation to the sales representative. The first conversation before he called the 800-number representative, he called Denver Price. And now I'm reading on page AR-289. Got it. Okay. So I'm going to start at line 5 from 289. And what did you do once you prepared that preliminary spreadsheet? Well, at some point in the time I gave call to Denver Price wanting to know where and how I should submit this estimate, he then gave me, I believe it was an 800-number for a central claims office for Yale Freight. What's your best recognition as to how long after receiving the invoice, which I believe was March of 2000, as to how long after receiving the invoice you called Mr. Price less than a month? Would you be able to pinpoint it any further than that? No, not to an exact date. Sorry, not to an exact date, no. So to the best of your recollection, it would have been in the March or April time frame that you had this conversation with Mr. Price. That's correct. Did you give Mr. Price the preliminary dollar number that you had worked out in your spreadsheet? I believe I mentioned on the phone that it was in the neighborhood of $70,000 to $75,000. And what did Mr. Price tell you? He gave me the claims number to call, which I then followed up with a phone call to that office. It looks like everybody's bouncing this along. Bouncing somebody else? Price says, I'm the wrong number. Call the claims office. He calls the claims office. She says, I don't want to hear it. Send in a form. That's the frustration that we had, Your Honor. But then he didn't send in the form. Well, he did send in the form. We can go through the process, but what happened is they said, don't give me a dollar amount. That's not what I want. What I want you to do is figure out on which shipment each pump came in. So we received six shipments of pumps on six different freights, and a number of them were damaged. We took them to Ingersoll Addresser to have them repaired. They gave us an invoice with all of these pumps damaged, but there's no indication as to which pump came on which shipment. So what he probably should have done is say, I'm not going to go to all that trouble for you now. If I do that, you'll get the information in court when I sue you. And right now, here's the invoice. Pay the money. He trusted Yellow Freight. What can I say? Yellow Freight said, don't send in your dollar estimate. I don't want to hear it. You go on this wild goose chase to try to put this together that doesn't fit together, which he struggled with, and eventually he did get it to them in the way they wanted it. But you could say under the law, if he was a lawyer, maybe he would have done something different. But I think the bottom line is the Ninth Circuit says, look, you don't have to have a dollar amount. It says oral communications count, and he gave them the dollar amount orally. I think under the Ninth Circuit, there's no question. Well, it can't be that you give the dollar amount to anyone orally it's good enough. I mean, if you tell the moving man as he's moving your stuff in, oh, my gosh, you broke this table. This is a $900 table. That probably isn't enough to give the company notice. I think as a matter of general law, an employee of the company, his knowledge is held to the company. But it's a reasonable person to go to. Denver Price was the person at the site who inspected the damaged property when it arrived. He's the person he wrote the initial letter to. No one wrote him back and said, I'm sorry, don't write a letter to Denver Price. Denver Price, from all appearances, was exactly the right person to send the information to. Counsel, I think the issues are on the table. Why don't we hear from the other side, and you still have reserved time. Thank you, Your Honor. James Attridge on behalf of Yellow Freight. Attridge, I think you've got a pretty big burden here to tell us why we shouldn't follow GI trucking in this case. I don't think that you necessarily have to abandon GI trucking at all. As a matter of fact, I was going to address that first. I don't think that there's this dichotomy where you have to either go with the statute or go with the decision. Because if you read the decision, first of all, in GI trucking, what the Ninth Circuit did in that decision was adopt the holding, expand upon the holding in the Taisho case that said that there's a narrow exception here, that instead of strict compliance, in certain circumstances, substantial compliance will do. Substantial compliance does not mean minimal compliance. Substantial compliance doesn't mean some compliance or arguable compliance. It still means that it has to be substantial. And what is very, very different in this case procedurally is that this case comes to you after a trial. This is not a de novo review of the facts. Yeah, but you don't have a finding of fact that helps you as far as I can tell. You don't have a finding of fact that says they didn't send the spreadsheet as they claimed. And you don't have a finding of fact that says he didn't tell Denver Price the 70 to 75,000 figure as he claimed. If you had either of those findings of fact, then you'd be home free. Well, we'll acknowledge that he probably said to Denver Price over the phone, I think it's going to be about $75,000. I'm not going to dispute that at all. Why isn't that good enough? Because what Denver Price said in response to that, he's not in the claims department. He's the local terminal manager. All he's got is this form. He tells them to call the right person. They call the right person, and the right person says, here, go and fill out these forms. But why isn't it fair to say once he tells Denver Price the company has noticed it's a $70,000 to $75,000 claim, they have what they need, and Denver Price is helping the shipper along by saying, if you want to actually get your money, I'm not the guy that can give it to you. You have to go to the claims department to get your money. So that's supplemental rather than necessary to let the company know that it's 70 to 75. It stands to reason, and you touched upon this before, and there's actually a case law I cited on it that says that when you have a large company, and this is to follow up on your example of telling the mover, hey, this stuff is worth $90, if you want to file a claim, you have to file it with the claims department, especially if you are made aware by the company representative that that is what you should do. That shouldn't alarm the project manager of a $150 million project that he should send this claim form to the right place. It's also in the findings of fact that he had done this before. He knew about the nine-month rule, and I dispute the version of the facts that was just presented to you about what it was Yellow requested of him in filling out the forms. It wasn't as they like to say that our forms were particularly arduous. The problem was we made the reasonable request of saying, please identify the pumps that got repaired as being pumps that we in fact transported out there. We're not going to pay to repair something that we didn't damage. That's what made it cumbersome, and it's not because of our forms. It's because of the Ingersoll dresser forms that made that difficult for them to do. But nonetheless, they still had nine months to do it. What is even more important is that as of March 16th, which is just a few weeks after he sends this letter, he's still got seven months. On March 16th, he knows the magic number, and he never fills that out on a claim form. He's got a check he sends out in June. He has the claims forms by that time. If he had simply sent the forms in and said we want $75,000, that would have sufficed. Why does he have to make claim on a specific form furnished by the company? Is that part of the bill of lading? No. He doesn't have to do that. All right. So if he had just sent the repair invoices, he would have been home free. Yes. And when he communicates that, and they tell him, no, you can't do that. You've got to use our forms. You've got to split it up into different shipments. And they put additional burdens on him for which he ultimately complies. Not timely, but complies. No, that's not an additional burden. That is something any reasonable person would do. No, it's what you lay down on him. As I said, if he just packed up the bills he got for the repairs and sent them to you, you'd be happy, huh? We would be happy, because that would be a detrimental amount. Then why does he tell me he had to do this and break it down into different shipments and put it on your forms? Because that would have made it easier for us to say yes and get the claim paid. It seems like unless he had reason to think he was shipping some of his pumps through a different shipper, it has nothing to do with making it easier for you to say yes and paying. It just has to do with knowing what moving men or subcontractors or whoever to blame and try to lay it off on. If he had sent us the forms, sent us a letter, supplemented his letter with those invoices, that would have satisfied the determinable amount requirement. He's making an honest effort to comply with notice to you, and all the response he gets from Yellow is making it more difficult. No, I disagree with that entirely. If you read the record, he writes one letter on September 8th making a promise that he's going to follow up. He then follows up orally with the person who sends him to the right department. They give him the forms to fill out. Now, that does not appear to be an overwhelming, arduous process. From that point on, he's got months and months and months to do this, and as he testified himself, this was at the bottom of his to-do list. He took care of this. Well, we never even got the form. That's another factual dispute. But he himself says he took care of it right before he left and went to another job. He put this at the bottom of the pile. And what I would encourage the Court to look at is a line of cases that were abandoned in the reply brief. Now, granted, they are district court decisions below, but they are in harmony with ex parte 263 drafted by the Interstate Commerce Commission, which essentially says, look, within that nine-month period, if you know the number, you've got to send it in. Now, there are certain circumstances where the cases are rare, but you may have to send a machine back to Switzerland to be repaired, and you're not going to know what the magic number is within nine months. Okay. Well, equity would dictate that substantial compliance in a situation like that is sufficient. But what the trial court here found, what the finer fact here found was he was unpersuaded that there was substantial compliance. Now, it is – I'd like to go back to Judge Kleinfeld's comment about what he found and what he didn't find, because on that particular point, you'll notice if you read it again, that Magistrate Zimmerman pumped it as to what the fact was one way or the other. Essentially, if you read it, he says, well, they said this and they said that. I noticed that. And he doesn't do anything with it. But when he examines the evidence in its totality – and this is what I don't like about the findings of fact and conclusions of law. I love the ending of it, which is why I'm not the guy who appeals. But what he, in essence, did was he took the record in front of him. He applies a substantial compliance standard. There's nothing in the record that says he didn't apply that standard in his thinking. He examined the evidence and said, as a finder of fact, this isn't substantial compliance. It's not substantial compliance to know on March 16th how much the claim is for and never follow up with a writing as required by the regulation with which the guy says he's completely familiar and to slough it off until your last day at work. That is not sufficient. Because, you know, you've got to understand one of the things is that the carrier in this situation, when there's a delay, is prejudiced because we're the ones who are ultimately going to have to pay if the claim is provable. And in order to conduct our investigation, you would rather do it sooner than later while the evidence is fresh. And this isn't a big problem for – Let me focus on one phrase in the findings. Okay. The magistrate judge does say that when Williams called Price, he says, quote, he says that Williams, quote, told him the damage amount. And I'm wondering why under Culver and GI trucking that doesn't mean you lose. Well, first of all, in Culver and GI trucking, those were summary judgment motions that were remanded back so that the appellate court was required to view the factual record in the light most favorable to the nonmoving party. Here we have findings of fact and conclusions of law, and he states it as a conclusion of law that there was no substantial compliance. But – Yeah, but we don't defer at all to the conclusions of law. We just defer to the findings of fact. Yeah. The point I'm trying to make is he puts it in the conclusions of law as a conclusion of law, but it is, if you examine it, actually a finding of fact. Well, what I'm raising is a finding of fact that's labeled as such that Williams told Price the amount, and I'm wondering why that isn't like – why that doesn't fit within GI trucking and Culver. Because he did not find that piece of evidence, oral evidence, sufficiently weighty for him to believe that a substantial compliance standard was met. And he is the finder of fact. I mean, let's put it this way. Let's say this was a jury trial, God forbid, and the jury would then be instructed they have to substantially comply. They'd receive a defining instruction as to what substantial compliance means, and then they'd get an interrogator saying, did he substantially comply or not? And that is actually the thought process that the judge had to go through here. So my conclusion, what I'm urging on the Court, is to reread his findings of fact and conclusions of law for what they really are, because they're somewhat inelegantly stated. He applied the right standard. He looked at the evidence, and then he found, he says as a matter of law, it was actually as a matter of fact that this body of evidence did not show substantial compliance. And that is what I'm urging on the Court in that sense. Now, first of all, he sent it to the wrong person. He's done this before. He sent it to the wrong person. In the February 8th letter, he promises to follow up. He says, stay tuned. It's coming around the mountain. And it never does. He makes a promise in there that is inchoate and never followed up upon until he leaves his job on the last day from this project that goes awry. Remember, this loss amounted to less than one-half of one percent of the value of this project. It was obviously at the bottom of his list, and he shunted it off. And there is this line of cases I have urged upon you, the General Electric v. Brown case, Cherkis v. Atlas Van Lines, that interpret 263, which is the agency decision, as saying that if you lollygag your claim, you're out of luck. And that is what he did in this circumstance. He could have sent those invoices that add up to $75,000, which is what 263 anticipates as determinable means in a claim. In other words, you don't have to put the dollar amount down, but you can attach invoices. What authority says that telling somebody who appears to have authority isn't good enough if you don't submit it to the claims department? I don't have that. Other than the citation I made in my brief to this old railroad case in which the language is that essentially, oh, it's in Mackie, actually. Pardon? It's in the Northern Pacific Railroad v. Mackie, which is actually the Ninth Circuit decision, which appeared to adopt a strict compliance standard, which was then slightly deviated from in the Taisho and GI trucking line of cases. Hearing this discussion makes me wonder. Obviously, the company seems to concede liability to pay something. Has this case been referred to mediation at all? Have you gone through that step here in the Ninth Circuit? Oh, no, not at the Ninth Circuit. We didn't. We went through the – I think we had two settlement conferences in the district court, and it didn't go through mediation here. But, you know, this gets back to this point I was making earlier. One of the reasons why we had to concede liability in this case is because we never got a claim that we could examine until 22 months after this loss, okay? So we could not work up our file to the extent we would have been comfortable going to trial anyway. And we also – When did you first examine the physical damage? We examined – Physical damage. Okay. On January 6th, which was after a couple of the shipments had arrived. Not after all of them had arrived. So I don't know whether it's 1 percent or 99 percent, but it's somewhere in the middle there. The other thing is that – And did you have access to further damages as further shipments came in? There was – Physical damage. Well, there was no – we go out and do an inspection when the shipper, or the consignee in this case, requests it. And there wasn't one – Does that process go on through all the shipments? No. He just went out once, and the last couple of shipments were not – there was no inspection requested. So none was given. Another thing, you have to understand that in this circumstance, we don't have a gift of clairvoyance. And we don't know, as of February 8th, even whether or not the eventual claim is going to come from Caverner at all, because we don't know what – we've never seen Caverner's contract with Ingersoll. It could be just as well that Caverner sends those things back to Ingersoll, and Ingersoll has them under some sort of warranty, and we end up getting a claim later on from Ingersoll, or perhaps no claim at all. The other thing, if you put yourself in the shoes of a person who does this for a living, freight loss and damage, which amounts to approximately 1 percent of all the shipments in the United States, this tends to be a random act. It happens because of an accident. It happens because of a theft. It happens because rain gets into the truck on a particularly rainy day. When the same stuff goes from the same place to the same place and gets damaged six or seven times in a row, that tends to make one – that is not a random act. That is a pattern act. And normally that points to the fact that it's not the trucking company's fault, that would be either that the machines were not in good condition at the beginning or they weren't properly packed. It's extremely odd when you do the math for six shipments that are so identical in a row to all have the same type of damage. So when we look at this preliminarily, we cannot look into the future and know that this is going to be, first of all, a legitimate claim, a claim that's going to be filed by the consignee instead of the consignor or somebody's insurance company or a bonding company because this was some big construction contract. We don't know where it's coming from. If we were to write a $77,000 check to Caverner, we could very well get a claim from Ingersoll a couple of days later on the day before the nine months runs out and we're stuck. So the claims filing rules, the rationale for it – either dispute the claim or require a hold harmless clause. That's done all the time in medical pay insurance in order to deal with subrogation risks. And the hold harmless form is on the claims form we send them. So, in other words, one of the reasons why we want the claims form sent in is so we know that this is somebody who's representing on a penalty of perjury, that they, in fact, are the holder of this claim. We're not dealing here with whether you could legitimately reject the claim, just whether a claim was timely made. Yes. It's only because it's very common in a fairly large claim like this one that was assigned to one of only two people at Yellow that handle them this big that once the claim comes in, there is a little more give and take back and forth. Sure. You know, show us how much it is and things like that. This is not sufficient to get that process started. Do both sides agree that the claim is somewhere in the $75,000 range? I mean, as opposed to $300,000 kind of thing. No, I never doubted. We figured they were on the level about what the amount was. They sent us the, you know, there's a copy of the check. So we're not disputing. There's a copy of what? There's a copy of the check in evidence that they paid to Ingersoll. So that's good enough for us. I could have pursued it in discovery, but I don't think I would have found anything. So in light of that, I want to get back to what makes this case so different from GI trucking. Because the only default in GI trucking, the insurance company said, we're the subrogated insurer, we hold the claim, here's the bill of lading, here's the stuff, and it's going to be about a $100,000 estimate, which was the policy limit. So certainly in that circumstance, GI trucking should have been sufficiently goosed to start a claim file, because it should have raised their eyebrow. But here, when somebody says, I am going to send you a claim someday when I figure out what the amount is, that does not spur the carrier to open up a claim, because that is so inchoate, and it is in the findings of fact. Only 5% of inspection reports ever ripen into a claim. Sometimes when somebody says they have a claim, it doesn't always come down the pike. Did they make any investigation? Did Yellow make an investigation? No. Because our version of events, which is not disputed in the findings of fact, he says he sent us the claim form in December, which was two months too late. We first found out about it in the claims department 22 months late, or after 22 months. So that was the first we learned about it. And at that point in time, we don't conduct an investigation. Of course, because this claim was so late, we can decline it under the law. So what you're saying is you never really had a claim, never opened a file. We never opened a file. What about that inspector that went out and saw the first shipments? Inspections are not claims. One in 20 of them ripen into a claim. And at 1035, 49 CFR 1035, it specifically says that inspection reports are not deemed to be claims. If an inspector went out, what do you do with this sentence in Culver, Culver v. Boat Transit? We said, so we're bound by this, though it's hard to understand under the regulation. After TISO, a written notice of damage coupled with a clearly communicated intent to hold the carrier liable, plus the carrier's investigation, suffices as a written claim. It looks to me as though you have the written notice of damage in that letter, and you have a clearly communicated intent in the letter to hold the carrier liable. And when you send an inspector out, that would be plus the carrier's investigation. How do you – what are we supposed to say about that sentence in TISO if you win? About the sentence in TISO? In Culver. Or Culver, I meant, about TISO. The sentence in TISO was somewhat an overstatement of the rule, and it should be read in light of the facts of the case. It should be read in light of the facts of the case, which are starkly different than they are here. We showed up, Boat Transit showed up, said, bring it to this repair shop, we'll pay it. You know, send it to your insurance company, tell your insurance company we'll pay it. I mean, they were making flat-out oral guarantees about the amount of money. It wasn't just they were told what the amount of money was. They reflected back that they were going to pay that amount of money. So I think if you look at that sentence against the factual backdrop in that case, it's light years removed from what the facts were in ours. Counsel, your time has expired. Thank you very much. Mr. Tippmann, you have some reserve time. Just a few points, Your Honor. I believe, in fact, the telephone conversation is dispositive of the case. Under GI Trucking and Culver, I don't think there's any doubt that oral communications of that nature count. Opposing counsel cited Mackey, the Mackey decision for the opposite conclusion. However, in Culver, Mackey was almost explicitly overturned on that question. In Culver, as you recall, there were virtually nothing in writing except the damage notation on the bill of lading. So the Culver, the ---- Well, I'm not sure I can follow that. Culver was a three-judge panel. Was it not? The appellate decision was a three-judge panel. All right. Well, three-judge panels cannot overrule other authorities of this Court. It takes an in-bank panel to do that. Well, then it distinguishes it to the point that my case, our case, is no longer controlled by Mackey. Citing Mackey for the proposition that oral communications don't count, this Court said Mackey initially appears controlling. However, in a case decided after that, referring to Tycho, we concluded that former requirements of written communication, written communication to inform the carrier that is being held responsible for the damage may be relaxed when the carrier is given written notice of the fact of damage, which happened here, has conducted a full inquiry, and is aware through other communication that reimbursement will be sought. So citing Tycho, he says oral communications now do count. And then he reads the passage that Judge Kleinfeld just read. After Tycho, a written notice of damage, which we have here, coupled with a clearly communicated intent to hold the carrier liable, which we have here, plus the carrier's investigation, suffices as a written claim. And I wanted to turn, if I could, briefly to that written inspection report. There is one point of it that hasn't come out yet. Not only do they conduct the --. Where are you? This is the inspection report at AR0410. Not only do they conduct the inspection and answer such questions as fully describe the commodity nature and extent of damage, but Denver Price of Yellow Freight then makes a note, Ingersoll representative to examine. So not only did they do their own inspection, they knew the property was going to Ingersoll dresser for repair, and at any time if they wanted to do anything more, it was at their disposal to do that. And I wanted to make another comment on Yellow Freight's failure to do a, quote, full inquiry, as they say. Now I'm turning to GI Trucking, where the same argument was made that's made here. Look, we didn't really do a full investigation, and therefore the words of Tycho don't apply. And this court responded to that argument. It is unclear from the record, now I'm reading, I'm sorry, from footnote two in GI Trucking, which is at 1F3rd at 907. It is unclear from the record to what extent GI investigated this claim, and then I go on to explain why there's that question mark. GI maintains that it did not perform the kind of investigation it normally would have in a case of a $100,000 claim because it believed that the goods would be salvaged. GI contends that this belief was based on representations made by ITEC and INA. Here's the important part. Were we to rule in GI's favor on the basis that a full investigation was not undertaken, we would create a rule that would permit a carrier to avoid liability by failing to investigate a claim, even when provided with the information necessary to undertake the investigation. Thus, we conclude that a carrier's failure to investigate a claim or failure thoroughly to investigate a claim when provided with the necessary information, including facts necessary to identify the goods, which we have here, and put the carrier on notice as to potential liability, which is no doubt we have here, will not prevent recovery for the damaged goods. I did want to respond to some of the other questions that came up. Let me ask you something about 410. It looks like it's a Xerox of a pink or yellow sheet, so it's really hard to read in the excerpts. I agree. Is there maybe they used a color copying machine, color inkjet or something in the original record? Do we have a better version somewhere? It also cuts off the very top and bottom of the page. It does. I think the important points are visible, and there was testimony. What are they so I can mark them? I think the important point is the date of the inspection. Where is it? Which is in the upper right-hand corner. What does it say? It says date of inspection, 01-06-00. So it's January. 01-06. What was that? 00 or the year 2000. 00, date of inspection. Yes. So the date of inspection is important. The part that is cut off, it says yellow freight, and there is testimony by the yellow freight representative at trial that that was a yellow freight form. Yes. Okay. Do I need any more except the date of inspection there? On the bottom left-hand corner, Denver Price's signature is cut off, and I think it's stipulated that that was Denver Price's signature. And finally, just the description of the damage, I don't think the particular words are important, except that it does say Ingersoll representative to examine, which I think is significant because it shows that they had access to the goods if they wanted to do anything further. And like in Clover, he effectively approved that it was going to Ingersoll for repair. Briefly, I think there's about three other points. Is this written by Denver Price, this inspection report then, and he's the one who put in this description of the nature and extent of the damage? That's correct. I believe that's stipulated, too, also. I'm running out of time. I wanted to jump through a couple quick points. There was one aspect of the regulation that we haven't quoted yet, and I think it's significant. If you look at 49 CFR 1005.2, subsection D, it addresses the question of what to do when we have a claim for uncertain amount, and the answer is that the carrier must go and do a further investigation and find out what the damage is. The other points I want to make are less essential, and my time is running out. So unless you have any further questions, I'll close. Thank you, counsel. Your time has indeed expired. The case just argued will be submitted for decision, and the Court will take a recess. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. All rise. It's okay. We're fine. We're going to resume the session. Please be seated. That's fine. The last case on the docket is LGS Architectural.
judges: Beezer, O'scannlain, Kleinfeld